UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| **TRISHA FLOYD and CHRISTOPHER FLOYD, on their own behalf and on behalf of their minor child S.F.**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE CITY OF SANIBEL, A FLORIDA MUNICIPAL CORPORATION and COMMUNITY HOUSING AND RESOURCES, INC., AND KELLY COLLINI, IN HER CAPACITY AS EXECUTIVE DIRECTOR OF COMMUNITY HOUSING AND RESOURCES, INC.,**<br><br>**Defendant,** | Court File No.: 2:15-cv-795-FtM-38CM<br><br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

## Introduction

1. Plaintiffs are residents of below market housing located on Sanibel, Florida that is owned and operated by Defendants. Plaintiffs bring the within action to prevent their eviction from their home and to obtain their lawful remedies against Defendants for violations of their lease and Chapter 83, Florida Statutes, and discriminatory practices under the Fair Housing Act and the Americans With Disabilities Act.

2. Defendants have illegally allowed dangerous toxic mold to exist at Plaintiffs' residence, which has essentially dispossessed them, and caused personal injuries. Defendants have unlawfully discriminated against plaintiffs, TRISHA FLOYD and S.F., who have a

1

debilitating sensitivity to toxic mold, by failing to take reasonable actions to remediate such mold, and to provide Plaintiffs with alternative housing until the mold is properly remediated.

3. Defendants have retaliated against Plaintiffs for registering objection to the dangerous condition in their home, and for demanding proper measures be taken. Each of the Defendants' actions violates the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act of 1973, and the Florida Fair Housing Act.

4. Plaintiffs seek damages for humiliation, embarrassment, emotional and physical distress, loss of housing, property damage, lost earnings, and personal injuries they have suffered as a result of Defendants' actions.

**Parties**

5. Plaintiff, TRISHA FLOYD ("TRISHA") is a resident of Lee County, Florida, who brings this action on behalf of herself and her three-year old son, S.F.

6. Plaintiff, CHRISTOPHER FLOYD ("CHRISTOPHER") is a resident of Lee County, Florida who brings this action on behalf of himself and his son S.F..

7. The CITY OF SANIBEL, FLORIDA (the "CITY") is a municipal corporation organized under the laws of Florida that is headquartered at 800 Dunlop Rd. Sanibel, Florida 33957. According to Section 3.1.6 of the Sanibel Plan, and Section 102-34 of the Sanibel Code of Ordinances, the CITY is responsible for establishing and operating the Below Market Rate Housing program ("BMRH"), which was established in 1989 to effectuate the policy, as set forth in the Sanibel Plan, to provide affordable housing to Sanibel residents.

8. Defendant, COMMUNITY HOUSING AND RESOURCES, INC. ("CHR") is a not for profit corporation organized under the laws of Florida, that has a principal place of business at 2401 Library Way, Sanibel, Florida. Pursuant to Section 102-33 of the Sanibel Code

of Ordinances, CHR is the housing foundation to whom the CITY has delegated the responsibility to carry out its obligations relative to the BMHR.  Upon information and belief, CHR is funded in whole or in part by a Community Development Grant by the United States Government in accordance with Title 42 Chapter 69 United States Code.

9. Defendant, KELLY COLLINI ("COLLINI"), is a resident of Lee County, and has been at all times material to the complaint as the executive director of CHR, and has the responsibility of managing and/or directing the activities of CHR relative to its responsibilities as delegated by the CITY.

## Jurisdiction and Venue

10. This court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

11. Venue is proper in the United States District Court, Middle District of Florida on the grounds that Plaintiffs and Defendants reside within the district, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the district, and the property that is the subject of the instant action is located within the district.

## ALLEGATIONS COMMON TO ALL COUNTS

12. It is widely recognized that certain molds when occurring indoors release chemical compounds known as mycotoxins, which elicit a harmful effect on human beings. Mycotoxins affect occupants of buildings primarily through inhalation of the mold spores. *Mycotoxins and Indoor Molds*, Sean P. Abbott, M.D. Indoor Environment CONNECTIONS, Vol. 3 Issue 4 2002.

13. The Florida Department of Health, the Environmental Protection Agency, the Centers for Disease Control and other governmental organizations grave health problems that may result from toxic mold exposure.

14. TRISHA FLOYD moved to Lee County in the latter part of 2014 with her son, S.F.  Later, in February 2015, she was joined in Lee County by her husband, CHRISTOPHER.

15. TRISHA and S.F. have heightened sensitivity to mycotoxin-producing mold. Upon exposure to toxic mold, they experience a substantial mental and physical impairment that substantially limits one or more of her major life activities.  The symptoms of their mental and physical impairment include, but are not limited to:

    a. Difficulty breathing.

    b. Reduced cognitive ability

    c. Extreme Fatigue

    d. Depression/Anxiety

    e. Memory Loss

    f. Vision loss

    g. Rash/hives/burning sensation on skin, eyes and nasal passages

    h. Irritability/mood swings

    i. Inability to concentrate

    j. migraines

    k. Sleeplessness/drowsiness

    l. Muscle, joint and abdominal pain

    m. nausea/vomiting

    n. irregular heartbeat

    o.  disorientation

 16.  S.F. likewise suffers from the same physical and mental impairment of his major life activities as TRISHA.

 17.  The Floyd family moved to Lee County from Maryland in the aftermath of a severe exposure to toxic mold in their residence. Upon arriving in Florida, TRISHA and S.F. recovered from their prior exposure to toxic mold.

 18.  In March 2015, the Floyd family applied to CHR for housing pursuant to the BMRH. The Floyd family met all the criteria for acceptance into the program and were assigned unit 10 (the "Unit") in the Woodhaven development ("Woodhaven") in Sanibel, Florida.

 19.  Woodhaven is a multifamily building containing 14 two bedroom apartments. Woodhaven was first occupied in 2005. The Woodhaven property is owned by the CITY by virtue of a special warranty deed dated December 8, 2008, which was recorded in the public records of Lee County, Florida at Instrument No. 2009000048718.

 20.  Woodhaven is operated and maintained by CHR as the CITY's agent, and by virtue of its role as the housing foundation delegated with the responsibility to carry out the CITY's obligations to provide below market rate housing.

 21.  Notwithstanding CHR's role in maintaining the Woodhaven property as its agent, the CITY maintains significant involvement in the CHR's operation of the BMRH. Upon information and belief, it provides funding for CHR, through the Community Development Block Grant program. The CITY provided funding of more than $290,000 to CHR in the year 2014.

 22.  In addition, it is extensively involved in CHR decision-making, including the determination of eligibility for the program, and the day to day operations of the BMRH program

and the management of its properties.  A CITY staff member sits on its board of directors to assist and act as a liaison.

24. Upon information and belief, the CITY currently maintains liability insurance which provides for indemnity for the claims asserted in this complaint.

24. Upon approval of the Floyd family's application by the CITY, CHR prepared a lease for the Unit, which was fully executed by the Floyds and CHR, in its capacity as agent for, and with the knowledge & consent of the CITY, on March 14, 2015.  The Floyd family moved into the Unit shortly thereafter.  A true and correct copy of the lease is attached hereto as **Exhibit A**.

25. Upon residing in the Unit, TRISHA and S.F. began to suffer the symptoms of toxic mold exposure.  However, initially, TRISHA was unsure of the cause of the symptoms.  Nonetheless, TRISHA immediately sought medical treatment for herself and S.F.

26. After the symptoms persisted for some time, TRISHA began to observe what appeared to be mold-like substance in certain areas of the Unit. Her physician directed that samples be taken of the mold and analyzed to determine whether mycotoxin producing molds were present in the Unit.

27. On or about June 18, 2015, CHRISTOPHER collected samples of the substance, and transmitted the samples to MYCOMETRICS, LLC, who, at TRISHA and CHRISTOPHER's expense, performed an analysis in accordance with Environmental Relative Moldiness Index, which identifies and quantifies mold based on DNA analysis.

28. On July 7, 2015, MYCOMETRICS issued its analysis.  In its report, MYCOMETRICS found high concentrations of a number of toxin producing molds within the unit.  On the same date, TRISHA communicated MYCOMETRICS' findings to Patti Bohm, a

representative of CHR, and requested that CHR and the CITY undertake measures to accommodate her and S.F.'s disability. Bohm responded by promising to move the Floyd family to a different unit. In addition, CHR proposed that a second test be conducted but nonetheless did not offer to pay for such test.

29. Between July 6, 2015 and November 13, 2015, despite TRISHA's numerous requests, neither CHR nor the CITY did anything to accommodate TRISHA and S.F.'s disability, address the presence of toxin-producing mold in the Unit, and to provide alternative housing to Plaintiffs. As TRISHA and S.F. continued to suffer from the debilitating symptoms of toxic mold exposure, they were forced to find temporary housing with friends. TRISHA's symptoms were so severe that she could not obtain or hold regular employment during this period. S.F. was unable to attend preschool because of his illnesses. As a result, the Floyd family income declined substantially.

30. In October 2015, with CHR and the CITY continuing to ignore her requests that they address the unsafe condition in the Unit, TRISHA met with COLLINI to request that appropriate action be taken. COLLINI responded by denying responsibility and indicating that "mold is everywhere" and threatening to evict the Floyd family. When TRISHA requested to meet with the CHR board, she was told "trust me you don't want to do that, that's not a good idea."

31. Later, TRISHA requested to meet with CHR's Landlord Tenant Committee. The request was denied by the Landlord Committee on November 3, 2015.

32. On November 9, 2015, TRISHA met with JUDY ZIMOMRA, the city manager for the CITY. During her meeting with ZIMOMRA, TRISHA fully disclosed her and S.F.'s disability, and the facts surrounding her family's occupancy of the Property, the mold present in

the Property, her and S.F.'s symptoms, and the lack of responsiveness of CHR representatives to the conditions existing at the Property. TRISHA requested that the CITY assist her in addressing the conditions and accommodating her and S.F.'s disability.

33. On November 10, 2015, CHR representative Bonnie McCurry ("McCurry") notified TRISHA by email that CHR intended to have a "mold specialist" perform a visual inspection of the Unit and perform his own testing on November 12, 2015.

34. On November 12, 2015, a man known as Gary Ranard with a company called Air Technologies visited the Unit. Upon review of the records of the Florida Department of Business and Professional Regulation, Mr. Ranard holds no valid license to perform mold assessment or remediation, and as such, could scarcely be characterized as a "mold expert." Nonetheless, in a report that was not produced until much later, Mr. Ranard noted that "A/C not keeping upon with needed function . . .if A/C is less than perfect it will not remove moisture enough and molds can grow on the coil." Ranard noted the presence of "dead or dried green mold" in the Unit.

35. On November 13, 2015, McCurry notified TRISHA that on November 18, 2015, CHR intended to install a new A/C unit and have Ranard "run oxidizers" and "heppa vac surfaces." To the extent that CHR's proposal could be fairly characterized as a remediation plan, it did not appear to comply with any established protocols, did not including pre and post plan testing, and was to be carried out by a person unqualified to perform mold assessment and remediation. In addition, the use of oxidizers has been recognized as ineffective to remove or remediate mold, and causes severe respiratory distress to the occupants of the property. *Ozone Project Summary; Generators in Indoor Air Settings*, Raymond S. Steiber U.S. Environmental Protection Agency National Risk Management Laboratory November 1995; http://www.epa.gov/indoor-air-quality-iaq/ozone-generators-are-sold-air-cleaners.

36. On November 16, 2015, Plaintiffs notified CHR and the CITY in writing that if the mold was not remediated or if Plaintiffs were not moved to alternative housing within 7 days, they intended to begin withholding rent, in accordance with Section 83.60, Florida Statutes.

37. On November 17, 2015, being concerned that CHR's proposed remediation might actually make matters worse; TRISHA requested that CHR postpone its proposed remedial measures for a period of 14 days, to enable the parties to come to an agreement as to the proper course of action.

38. On November 25, 2015, the Floyd family, through their counsel proposed the following in writing to CHR:

- Inspection and Assessment of the premises by a reputable person licensed as a mold assessor and remediator pursuant to Section 468.8414, Florida Statutes, conducted in accordance with BSR-IICRC S520, as promulgated by the Institute of Inspection Cleaning and Restoration Certification (IICRC).

- Pre-remediation air sampling and analysis to determine the presence of toxic molds about the premises, conducted pursuant to standard industry protocol

- Post-remediation verification and clearance testing to confirm the results of the remediation

- Provision of all reports generated by the assessment and remediation process to the Floyd family

39. CHR did not agree to perform any of the preceding measures. In addition, it did not agree to provide alternative housing for the Floyd family. Upon information and belief, the CITY was provided a copy of the Plaintiffs' proposal but took no action in response.

40. On December 9, 2015, as a result of CHR and the CITY's inaction with respect to the toxic mold problem in the Unit, and at her own expense, TRISHA and CHRISTOPHER hired John Cosgrove, CIE, of Radon & Mold Professionals to perform a mold assessment of the Unit. Mr. Cosgrove is a state-licensed mold assessor.

41. As part of his assessment, Cosgrove made a visual inspection of the Unit and collected air and surface samples of various areas of the Unit. The samples were analyzed for the presence of mold.

42. Based on his observations and laboratory analysis, Cosgrove concluded that there were elevated levels of Cladosporium, Ganoderma and Aspergillis/Penicillium in the Unit, which are molds known to produce mycotoxins harmful to human beings. Cosgrove blamed the elevated levels of mold in part to a HVAC system deficiency.

43. Based on his findings, Cosgrove made a number of recommendations, including, but not limited to:

    a. Repair and maintenance of the air handler and main return.

    b. Employment of a state licensed mold remediation contractor experienced in water damage and microbial remediation.

    c. Use of negative air machines equipped with high-efficiency particulate air filtration.

    d. Intrusive investigation to be performed at the carport ceiling areas displaying water damage to identify the full extent of areas requiring remedial treatment.

    e. Removal of all visible fungi through the use of a HEPA vacuum with the exception of areas where mold growth is embedded within the given material, which may need to be removed.

    f. remediate the areas where mold growth has been painted over by sanding and/or removal of the substrate.

    g. Post remediation verification by a licensed mold assessor.

44. The CITY, by and through its agent, CHR, threatened the Floyd family verbally and in writing that it will evict them, in retaliation for their complaints about the unsafe condition of the Unit.

45. Plaintiffs are in a precarious financial position in part because of TRISHA's inability to function at a level sufficient to maintain regular employment.  Their temporary housing arrangement will be unavailable beginning in January 2016.  At that time, if alternative housing is not provided, the Floyd family may be rendered homeless.

46. Defendants have unfairly discriminated against TRISHA and S.F. in the sale or rental of their dwelling by failing to make reasonable accommodations for their disability, specifically, their sensitivity to toxic mold, where such accommodations are necessary to afford them full enjoyment of the Unit.

## COUNT I - Violations of the Federal Fair Housing Act 42 U.S.C. §3601 et seq.
### (By TRISHA FLOYD and S.F. AGAINST ALL DEFENDANTS)

47. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

48. TRISHA and S.F. have a mental or physical impairment that substantially limits one or more of their life activities, to wit: mold sensitivity that when exposed to toxic mold manifest severe reactions that negatively impact their ability to concentrate, recall events, work, attend class and engage in other important life activities.  TRISHA and S.F.'s disability is long term and/or permanent.

49. As set forth in paragraphs 11 through 46 of the complaint, the CITY, CHR and COLLINI have violated the Federal Fair Housing Act by refusing to make reasonable accommodation in rules, policies or services, when such accommodations are necessary to afford TRISHA and S.F. equal opportunity to use and enjoy the Unit.

50. As set forth in paragraphs 11 through 46 of the complaint, the CITY, CHR and COLLINI have committed a discriminatory housing practice as defined in 42 U.S.C. §§3602 and 3617 by threatening eviction in retaliation for TRISHA and S.F.'s exercise of the rights afforded them by 42 U.S.C. §3601 et seq.

51. The CITY, CHR and COLLINI committed the aforementioned discriminatory housing practices intentionally, maliciously, and with callous and reckless disregard of TRISHA and S.F.'s federally protected rights.

52. As a result of the CITY, CHR and COLLINI's discriminatory housing practices, TRISHA and S.F. have suffered damages, including but not limited to, personal injuries, loss of income, and loss of their residence.

### COUNT II - VIOLATION OF AMERICANS WITH DISABILITIES ACT
### (BY TRISHA AND S.F. AGAINST THE CITY, CHR AND COLLINI)

53. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

54. THE CITY and CHR are public entities as defined in 42 U.S.C. §12131.

55. TRISHA and S.F. are qualified individuals with disabilities as defined in 42 U.S.C. §12131.

56. By the acts described in paragraphs 11 through 46 of the complaint, the CITY and CHR have engaged in discrimination, and TRISHA and S.F. have been subject to discrimination and/or denied the benefits of the services, programs or activities of the CITY and CHR on account of their disability, in violation of 42 U.S.C. §12132.

57. As a result of the CITY, CHR and COLLINI's violations of the Americans with Disabilities Act, TRISHA and S.F. have suffered damages, including but not limited to, personal injuries, loss of income, and loss of their residence.

## COUNT III - VIOLATION OF REHABILITATION ACT OF 1973
### (BY TRISHA AGAINST THE CITY, CHR and COLLINI)

58. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

59. TRISHA is a qualified individual with a disability who resides in the United States as defined in 29 U.S.C. §705.

60. The management and/or operation of the Unit and the Woodhaven development program is a program or activity, administered by the CITY, that receives federal financial assistance as defined in 29 U.S.C. §794.

61. As set forth in paragraphs 11 through 46 of the complaint, the CITY, CHR and COLLINI have violated 29 U.S.C. §794 by engaging in discrimination on the basis of TRISHA's disability.

62. As a result of the CITY, CHR and COLLINI's violations of the Rehabilitation Act of 1973, TRISHA has suffered damages, including but not limited to, personal injuries, property damage, loss of income, pain and suffering, emotional distress and loss of her residence.

## COUNT IV - VIOLATION OF FLORIDA FAIR HOUSING ACT
### (By TRISHA and S.F.)

63. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

64. Pursuant to Section 760.23(2), Florida Statutes:

"It is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, sex, handicap, familial status, or religion."

65. Further, pursuant to Section 760.23(7), Florida Statutes:

"It is unlawful to discriminate in the sale or rental of, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of:

13

(a) That buyer or renter;
(b) A person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
(c) Any person associated with the buyer or renter."

66. In violation of Section 760.23, Florida Statutes, the CITY and CHR unlawfully discriminated against TRISHA and S.F. by failing to make a reasonable accommodation for their handicap, and unlawfully imposing a burden upon to remediate the mold themselves both physically and financially.

67. The CITY and CHR's action in failing to take reasonable measures to protect Plaintiffs from the mold was an act of discrimination based on TRISHA and S.F.'s disability.

68. As a result of the CITY and CHR's violation of Section 760.23, Florida Statutes, Plaintiffs have suffered harm.

## COUNT V - BREACH OF LANDLORD'S DUTIES UNDER THE FLORIDA LANDLORD-TENANT ACT

69. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth herein.

70. THE CITY, CHR and COLLINI as owners/lessors of the Unit are landlords as defined in Section 83.43, Florida Statutes.

71. Pursuant to section 83.51, Florida Statutes:

(1) The landlord at all times during the tenancy shall:

(a) Comply with the requirements of applicable building, housing, and health codes; or

(b) Where there are no applicable building, housing, or health codes, maintain the roofs, windows, doors, floors, steps, porches, exterior walls, foundations, and all other structural components in good repair and capable of resisting normal forces and loads and the plumbing in reasonable working condition. The landlord, at commencement of the tenancy, must ensure that screens are installed in a reasonable condition. Thereafter, the landlord must repair damage to screens once annually, when necessary, until termination of the rental agreement.

72. Pursuant to Section 102-33 of the Sanibel Code of Ordinances, CHR is responsible to monitor conformance of the below market rate housing units with the various applicable building, housing, sanitary and related codes, ordinances, statutes and regulations.

73. Pursuant to Section 14-246 of the Sanibel Code of Ordinances, it is unlawful for any owner of real property within the city to create, keep, maintain or allow the existence of any dangerous building or hazardous land in or on such real property. Dangerous building is defined as, among other things:

> Those buildings which have become or are so dilapidated, decayed, unsafe, unsanitary, or which so utterly fail to provide the amenities essential to decent living that they are, by any applicable health code or environmental regulation, unfit for human habitation, or are likely to cause sickness or disease, so as to work injury to the health, safety or general welfare of those working or living therein or of the public.
>
> (5) Those buildings having light, air and sanitation facilities which are inadequate, by any applicable building or health code or environmental regulation, to protect the health, safety or general welfare of human beings who may live or work therein.

74. Chapter 386, Florida Statutes prohibits sanitary nuisances, which are defined as:

> " the commission of any act, by an individual, municipality, organization, or corporation, or the keeping, maintaining, propagation, existence, or permission of anything, by an individual, municipality, organization, or corporation, by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired, or by which or through which, directly or indirectly, disease may be caused."

75. The conditions in the Unit constitute violations of applicable building, sanitary or environmental codes, and constitute sanitary nuisances.

76. The CITY, CHR and COLLINI had actual or constructive notice of the unsafe condition of the Unit, yet failed take reasonable measures to remedy it.

77. As a result of the CITY, CHR and COLLINI's breach of Section 83.51, Florida Statutes, Plaintiffs have suffered injuries.

## COUNT VI- BREACH OF LEASE

78. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

79. Pursuant to the lease, attached to the complaint as **Exhibit A**, CHR and the CITY agreed to:

   a. Maintain the premises and the property in decent and safe condition;

   b. Comply with the requirements of applicable building codes and housing codes materially affecting the health and safety.

   c. Make necessary repairs to the premises

   d. keep property buildings, facilities and common area, not otherwise assigned to tenant for maintenance and upkeep in a clean and safe condition;

   e. maintain in good and safe working order and condition the electrical, plumbing, heating, ventilating, air conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by the Landlord.

80. Paragraph 13 of the lease stipulates that if the Unit is rendered uninhabitable, the Landlord shall offer standard alternative accommodations, if available, when necessary repairs cannot be made within a reasonable time.

81. The CITY, CHR and COLLINI violated the terms of the lease by failing to remedy uninhabitable conditions at the Unit which are violations of applicable health, sanitary or building code, and sanitary nuisances.

82. The CITY, CHR and COLLINI violated the terms of the lease by failing to provide alternative housing to Plaintiffs until such time as the Unit could be made inhabitable.

83. As result of Defendants' breach of the lease, Plaintiffs have suffered damages.

## COUNT VII -RETALIATORY CONDUCT

84. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

85. Pursuant to Section 83.64, Florida Statutes, it is unlawful for a landlord to bring or threaten to bring an action for possession primarily because the landlord is retaliating against the tenant.

86. Defendants engaged in retaliatory conduct by threatening Plaintiffs with eviction for exercising their rights under the lease and federal and state law.

87. As a result of Defendants' retaliatory conduct, Plaintiffs have been damaged.

## COUNT VIII - NEGLIGENCE

88. Plaintiffs repeat and reallege paragraphs 1 through 46 of the complaint as if set forth fully herein.

89. The CITY, as the owner of the Unit and landlord, had a duty to act with reasonable care to protect the health and safety of Plaintiffs.

90. The CITY as the owner of the Unit had a duty to maintain the Unit in a reasonably safe condition.

91. The CITY breached its duties to Plaintiffs by failing to provide a reasonably safe premises free of mold, and failing to undertake measures to remove the mold once it was advised of the presence of the mold.

92. As a result of the CITY's negligence, Plaintiffs have been damaged.

93. Prior to commencement of the instant action, Plaintiff provided to the CITY the notice of claim required under Section 768.28, Florida Statutes.  The CITY has denied the Plaintiffs' claim.

## IX-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94. Plaintiffs repeat and reallege paragraphs 1 through 46 and 93 of the complaint as if set forth fully herein.

95. The CITY's acts in failing to take Plaintiffs' complaints concerning the condition of the Unit seriously, and failing to remedy the unsafe condition within a reasonable time after it was brought to its attention, intentionally failed to discharge its duties to Plaintiffs.

96. The CITY's conduct was outrageous and as a result, Plaintiffs suffered severe emotional distress, which manifested itself in physical injury to Plaintiffs.

## Demand for Relief

**WHEREFORE, under all foregoing counts, Plaintiffs demand the following relief:**

1. Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 declaring that Defendants have violated the Fair Housing Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Florida Fair Housing Act and the Florida Landlord-Tenant Act.

2. Award compensatory and punitive damages to Plaintiffs and against Defendants.

3. Reasonable attorney's fees and costs; and

4. Such other relief as the court deems just and appropriate.

## Jury Demand

Plaintiffs demand a jury trial on all issues so triable.

Dated this 4th day of March, 2016.

Respectfully submitted,

By**: /s/ Christopher J. DeCosta_____**
**CHRISTOPHER J. DECOSTA, ESQ.**
**FLORIDA BAR NUMBER 271410**
HOLTZ MAHSHIE DECOSTA, P.A.
1560 Matthew Drive, Suite E
Fort Myers FL 33907
Telephone: (239) 931-7566
Facsimile: (239) 931-7560
Primary Email: chris@hmdlegal.com
　　　　　　　eservice@hmdlegal.com
Secondary Email: Jamie@hmdlegal.com
　　　　　　　Jennifer@hmdlegal.com