UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TRISHA FLOYD AND CHRISTOPHER
FLOYD, on their own behalf and on behalf
of their minor child, S.F.,

      Plaintiffs,

v.                               Case No: 2:15-cv-00795-SPC-CM

CITY OF SANIBEL, a Florida Municipal
Corporation, and COMMUNITY HOUSING
AND RESOURCES, INC., and KELLY
COLLINI, in her capacity as Executive Director
of Community Housing and Resources, Inc.,

      Defendants.

_____/

## ORDER[1]

      This matter comes before the Court on Defendant City of Sanibel's Motion to Dismiss Counts I through IX of Plaintiffs' First Amended Complaint dated March 28, 2016. (Doc. #45).  Plaintiffs Trisha Floyd, Christopher Floyd, and their minor child, S.F., filed a Memorandum in Opposition to Defendant City of Sanibel's Motion to Dismiss on April 11, 2016. (Doc. #46).  This matter is ripe for review.

### BACKGROUND

      Unless stated otherwise, the following facts are drawn from the First Amended Complaint and construed in a light most favorable to Plaintiff as the non-moving party.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their website. Likewise, the Court has no agreements with any of these third parties or their Web sites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

This case is about a discriminatory housing practice arising from a lease agreement between Community Housing & Resources, Inc. ("CHR"), as landlord, and Plaintiffs Trisha Floyd ("Trisha"), Christopher Floyd ("Christopher"), and S.F. ("S.F.") as tenants (collectively, the "Floyds"), in a housing unit owned by the City of Sanibel (the "City") through the Below Market Rate Housing program ("BMRH").  (Doc. #37 at ¶¶ 1-2; 14-19).

Trisha and S.F. "have [a] heightened sensitivity to mycotoxin-producing mold," which causes "a substantial mental and physical impairment that substantially limits one or more of [their] major life activities."  (Doc. #37 at ¶ 15).  In 2014, Trisha and her son, S.F., relocated to Lee County, Florida, from Maryland due to the toxic exposure of mold in their prior Maryland residence.  (Id. at ¶ 14 and 17).  In 2015, Christopher, Trisha's husband, joined his wife and son in Lee County.  (Id. at ¶ 14).  In March of 2015, the Floyds applied to CHR for housing under the BMRH program.  (Id. at ¶ 18).  Subsequently, the Floyds received acceptance into the BMRH program and the assignment of "unit 10 (the "Unit") in the Woodhaven ("Woodhaven") development in Sanibel, Florida."  (Id.).  Woodhaven consists of 14 two-bedroom units and is owned by the City.  (Id. at ¶ 19). The Floyds moved into the Unit after the execution of the lease on March 14, 2015.  (Id. at ¶ 24).

CHR operates and maintains Woodhaven.  (Id. at ¶ 20).  The City is also heavily involved in the BMRH.  (Id. at ¶ 21).  CHR receives funding through a Community Development Block Grant Program.  (Id.)  The City's contribution to CHR exceeded $290,000.00 in 2014.  (Id.)  The City is involved in decision-making that includes eligibility

determinations and everyday operations. (*Id.* at ¶ 22). The CHR board of directors consists of a City staff member who acts as a liaison. (*Id.*).

After moving into the Unit, Trisha and S.F. suffered symptoms of exposure to toxic mold. (Doc. #37 at ¶ 25). Unsure of the cause of their symptoms, Trisha and S.F. obtained medical care. (*Id.*). While the symptoms continued, Trisha observed a mold-like matter within the Unit. (*Id.* at ¶ 26). Trisha's physician instructed her to collect mold samples to establish the presence of mycotoxin in the Unit. (*Id.*). On June 18, 2015, Christopher obtained samples of the matter, and delivered such samples to MYCOMETRICS, LLC, for testing, at Christopher and Trisha's expense. (*Id.* at ¶ 27). On July 7, 2015, MYCOMETRICS reported high concentrations of toxic molds within the Unit. (*Id.* at ¶ 28). That day, Trisha conveyed MCOMETRICS' findings to Patti Bohm ("Bohm"), a CHR representative. (*Id.*). In response, Bohm promised to move the Floyds into another unit. (*Id.*). However, CHR never addressed the toxic mold, nor provided alternative accommodations to the Floyds. (*Id.* at ¶ 29). Because Trisha and S.F.'s debilitating symptoms continued, they lived with friends. (*Id.*). In fact, Trisha could not maintain employment and S.F. could not attend preschool. (*Id.*). Consequently, the Floyds' income significantly declined. (*Id.*).

In October of 2015, Trisha met with Defendant Kelly Collini, the Executive Director of CHR, and requested remedial action be taken. (*Id.* at ¶ 30). Collini denied responsibility, threatening the Floyds with eviction. (*Id.*). Although discouraged from doing so, Trisha requested a meeting with the CHR Board. (*Id.*). Trisha then requested a meeting with CHR's Landlord Tenant Committee ("Committee"), which the Committee denied on November 3, 2015. (*Id.* at ¶ 31). On November 9, 2015, Trisha met with a City

manager, Judy Zimomra ("Zimomra"), and discussed the presence of mold in the Unit and requested the City's assistance.  (*Id.* at ¶ 32).  On November 10, 2015, Trisha received e-mail notification that CHR intended to have an inspection of the Unit by a "mold specialist."  (*Id.* at ¶ 33).  Gary Ranard ("Ranard") with Air Technologies visited the Unit on November 12, 2015.  (*Id.* at ¶ 34).  However, Ranard does not hold a valid license for assessing or remediating mold.  (*Id.*).  Nevertheless, in Ranard's report, he noted the presence of "dead or dried green mold."  (*Id.*).  On November 13, 2015, CHR notified Trisha of its remedial action, which included installing a new A/C unit and running oxidizers and heppa vac surfaces.  (*Id.* at ¶ 35).  On November 16, 2015, the Floyds notified CHR that if the mold was not removed, they intended to withhold rent, per Fla. Stat. § 83.60, and would seek alternative living arrangements within 7 days.  (*Id.* at ¶ 36). Thereafter, Trisha feared that CHR's remediation plan could potentially make the situation worse, and requested CHR to postpone the remediation for 14 days.  (*Id.* at ¶ 37).

On November 25, 2015, the Floyds, together with counsel, proposed a remedial plan in writing to CHR.  (*Id.* at ¶ 38.).  CHR refused to perform such measures and provide alternative accommodations.  (*Id.* at ¶ 39).  In response, Trisha and Christopher hired a state-licensed mold assessor, John Cosgrove ("Cosgrove"), to collect samples from the Unit.  (*Id.* at ¶¶ 40-41).  Cosgrove observed, and laboratory testing confirmed, harmful molds that produce mycotoxins.  (*Id.* at ¶ 42).  Cosgrove noted a HVAC system deficiency causing elevated mold levels.  (*Id.*).  Cosgrove provided several recommendations to remediate the mold; nonetheless, CHR made verbal and written threats of the Floyds' eviction in response.  (*Id.* at ¶¶ 43-44).

On December 21, 2015, the Floyds commenced this suit in the Middle District of Florida, Fort Myers Division.  (Doc. #1). The City filed a motion to dismiss on February 22, 2016, which the Court denied as moot after the Floyds timely filed their First Amended Complaint.  (Doc. #35 and #37). The Floyds' First Amended Complaint alleges violations of the Fair Housing Act; Americans with Disabilities Act; Rehabilitation Act of 1973; Florida Fair Housing Act; and the Florida Landlord-Tenant Act.   (Doc. #37). Additionally, the Floyds brought causes of action for retaliatory conduct; breach of lease; negligence; and intentional infliction of emotional distress.  (*Id.*). The City now moves to dismiss Counts I through IX of the Floyds' First Amended Complaint. (Doc. #45).

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the reviewing court must accept all factual allegations in the complaint as true and view them in a light most favorable to the plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). This preferential standard of review, however, does not permit all pleadings adorned with facts to survive to the next stage of litigation. The Supreme Court has been clear on this point – a district court should dismiss a claim where a party fails to plead facts that make the claim facially plausible. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible when the court can draw a reasonable inference, based on the facts pled, that the opposing party is liable for the alleged misconduct. *See Iqbal*, 556 U.S. at 678. This plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 557 (internal quotation marks omitted)).

**DISCUSSION**

**A.  DELEGATION OF THE CITY'S RESPONSIBILITIES TO CHR**

The City argues, without legal authority, that dismissal is appropriate because the City delegated its responsibilities to CHR.  (Doc. #45 at 2).  In response, the Floyds argue that the City is directly liable as the Unit owner.  (Doc. #46 at 2).

A property owner is ultimately responsible for his "non-delegable duty to provide reasonably safe premises for its invitees."  *U.S. Sec. Services Corp.*, 665 So. 2d 268, 271 (Fla. 3d DCA 1995); *see also Garcia v. St., Dept. of Nat'l Resources*, 707 So. 2d 1158, 1159 (Fla. 3d DCA 1998).  Although another entity operates and maintains the property, the owner remains responsible and liable.  *See Garcia*, 707 So. 2d at 1159.  Turning to this action, the City, as the Unit owner, cannot delegate its duty to provide a reasonably safe premises.  (*Id.* at ¶ 19).  Consequently, the City's delegation argument fails.

**B.  HOUSING CLAIMS**

The City argues that the Floyds failed to allege enough facts to establish a violation of the Floyds' federal rights.  (Doc. #45 at 3).  The Floyds assert that the pleading standard is low, and they have sufficiently pleaded the allegations to put the City on notice.  (Doc. #46 at 3).  The Court addresses each federal claim in turn.

**1.  COUNT I: FEDERAL FAIR HOUSING ACT**

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  Under 42 U.S.C. § 3604(f)(3)(B), discrimination consists of "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

One must prove four elements to establish a failure-to-accommodate claim: "(1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation." *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citation omitted)). One is handicapped under the FHA if he has, "(a) a physical or mental impairment which substantially limits one or more of such person's major life activities, (b) a record of having such an impairment, or (c) [is] . . . regarded as having such an impairment." 42 U.S.C. § 3602(h). The definition of a disability under the ADA is identical to the FHA. *See Bhogaita*, 765 F.3d at 1287. "The term 'substantially limiting' comprises either (1) the inability to perform a major life activity that the average person in the general population can perform, or (2) a significant restriction as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to that of the average person in the general population." *E.E.O.C. v. Am. Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1274 (M.D. Fla. 2014) (citing *Rossbach v. City of Miami*, 371 F.3d 1354, 1356-57 (11th Cir. 2004)). "The term 'major life activities' is defined as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id.*

Turning to this action, Trisha and S.F. assert that their "mental or physical impairment [] substantially limits one or more of their life activities, to wit: mold sensitivity that when exposed to toxic mold manifest severe reactions that negatively impact their ability to concentrate, recall events, work, attend class and engage in other important life activities." (Doc. #37 at ¶ 48). Secondly, the Floyds allege that Trisha met with the City

7

manager to discuss the presence of mold in the Unit and its impact, and CHR failed to address the mold and create an accommodation.  (Doc. #37 at ¶ 32).  Moreover, the Floyds assert that they proposed a four-point remediation plan and informed CHR and the City that they intended to withhold rent if the mold was not remediated, but the City took no action.  (*Id.* at ¶¶ 36, 38, 39).  Consequently, Count I survives the City's motion to dismiss.

### 2.  COUNT II: AMERICANS WITH DISABILITIES ACT (ADA)

"Subject to the proof this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "To establish a prima facie case under the ADA, a plaintiff must demonstrate that (1) he is disabled under the ADA, (2) he is a qualified individual, with or without accommodations, and (3) he was unlawfully discriminated against because of his disability." *E.E.O.C.*, 21 F. Supp. 3d at 1274.  A "[p]ublic entity" is defined as "any State or local government." 42 U.S.C. § 12131(1)(a).  As stated, the definition of a disability under the ADA is identical to the FHA.  *See Bhogaita*, 765 F.3d at 1287.

Turning to this action, the Floyds allege that the City is a "public entit[y] as defined in 42 U.S.C. §12131."  (Doc. #37 at ¶ 54).  Trisha and S.F. assert that their "mental or physical impairment [] substantially limits one or more of their life activities, to wit: mold sensitivity that when exposed to toxic mold manifest severe reactions that negatively impact their ability to concentrate, recall events, work, attend class and engage in other important life activities."  (Doc. #37 at ¶ 48). The Floyds applied and "met all the criteria

for acceptance" into the BMRH program.  (Doc. #37 at ¶ 18).   Finally, the Floyds assert

that the City, as a public entity, denied the benefits of the BMRH program to the Floyds

by failing to remove the mold from the Unit, which caused Trisha and S.F. to suffer injury

to their health.  (*Id.* at ¶ 56).  Therefore, Count II survives the City's motion to dismiss.

### 3.  COUNT III: REHABILITATION ACT OF 1973

The Rehabilitation Act of 1973 provides:

> No otherwise qualified individual with disability in the United
> States, as defined in section 705(20) of this title, shall, solely
> by reason of her or his disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal
> financial assistance or under any program or activity
> conducted by any Executive agency or by the United States
> Postal Service.

29 U.S.C. § 794(a).  An "individual with disability" is defined as one who "has a physical

or mental impairment which for such individual constitutes or results in a substantial

impediment to employment…"  § 705(20)(A)(i).

In this action, the BMRH program received federal funding.  (Doc. #37 at ¶ 60).

Trisha is a United States resident who suffers from a heightened-sensitivity to toxic mold.

(*Id.* at ¶ 15).  Trisha avers that the City engaged in discrimination against her because of

her sensitivity to mold and failed to remediate the toxic mold in the Unit.  (*Id.* at ¶ 25-46).

Because of the continued presence of mold in the Unit, Trisha submits that she could not

maintain employment and was denied the benefit of the BMRH program.  (*Id.* at ¶ 29).

Consequently, Count III survives the City's motion to dismiss.

### 4.   COUNT IV: FLORIDA FAIR HOUSING ACT

The City moves for dismissal of Trisha and S.F.'s claim under the Florida Fair Housing Act ("FFHA") because the Floyds failed to exhaust their administrative remedies as required under Fla. Stat. § 760.34(1).  (Doc. #45 at 4 n.2).  In pertinent part, § 760.34(1) provides that "[a]ny person who claims to have been injured by a discriminatory housing practice or who believes that he or she will be injured by a discriminatory housing practice that is about to occur may file a complaint with the commission."  In support, the City cites to *Belletete v. Halford*, 886 So. 2d 308 (Fla. 4th DCA 2004).  In *Belletete*, a tenant sued his former landlord under the FFHA.  *Id.*  The court held that the language in § 760.34(1) is mandatory and, therefore, the tenant could not bring an FFHA claim because he did not first file a complaint "with the Commission on Human Relations." *Id.*  (citations omitted).

Nevertheless, the Court finds *Milsap v. Cornerstone Residential Mgmt., Inc.*, No. 05-60033-CIV, 2010 WL 427436, at *4 (S.D. Fla. Feb. 1, 2010), persuasive here.  In *Milsap*, the court held that an individual is not required to exhaust their administrative remedies before filing a claim under FFHA.  *Id.*  The court held that "the legislative history, express language, spirit and intent of the FFHA are in direct contradiction to the *Belletete* ruling[.]"  *Id.*  The court noted that *Belletete* "did not apply fair housing case law in its analysis," but, instead, looked to the Florida Civil Rights Act.  *Id.* at *1.  Because "[t]he clear import of the . . . statutory language indicates a complainant may file a complaint and exhaust administrative remedies or, alternatively, commence a civil action," the Floyds were not required to exhaust their administrative remedies before filing this suit and thus, Count IV survives the City's motion to dismiss.  *Id.* at *4.

10

## C.  COUNT V: FLORIDA LANDLORD-TENANT ACT

In response to the City's blanket argument that "[n]one of the claims state valid claims upon which relief can be granted against the City," the Floyds argue that the City's liability under Fla. Stat. § 83.43(3), is based upon the City's status as Unit owner.  (Doc. #45 at 1; #46 at 7).

Under the Florida Landlord-Tenant Act, a "landlord" includes "the owner or lessor of a dwelling unit."  § 83.43(3).  A landlord must comply with health codes.  § 83.51(1)(a).  Turning to this action, it is undisputed that the City owns the Unit.  (Doc. #37 at ¶ 19).  Additionally, the Floyds assert that S.F. and Trisha suffered injuries because of the City's violation of Sanibel, Florida, Municipal Code § 14-246 and Fla. Stat. § 386.01.  (Doc. #37 at ¶ 73-74; Doc. #45 at 2).  Taking the factual allegations of the First Amended Complaint as true, Count V survives the City's motion to dismiss.

## D.  SOVEREIGN IMMUNITY AS APPLIED TO THE CITY

The City argues that the Floyds seek to create additional tort liability not available under Fla. Stat. § 768.28.  (Doc. #45 at 5).  The Floyds make three arguments:  (1) sovereign immunity is waived as to the City's liability insurance, pursuant to Fla. Stat. § 768.28.  (Doc. #46 at 6-8); (2) the City is liable as an undisclosed principal on the subject lease agreement; and (3) the City, as the Unit owner, acted in a private capacity and, therefore, owed a duty of a private property owner.  (Doc. #46 at 6-8).  The Court addresses each argument in turn.

### 1.  LIABILITY INSURANCE AS A WAIVER OF SOVEREIGN IMMUNITY

First, the Floyds argue that the City "waives sovereign immunity to the extent of its liability insurance."  (Doc. #46 at 8).  Governmental tort liability insurance waives statutory

sovereign immunity up to the policy limit.  *See Avallone*, 493 So. 2d at 1004-05.  Here, the City purchased liability insurance for indemnification.  (Doc. #37 at ¶ 23).  Consequently, the City has waived its sovereign immunity up to the policy limit of its liability insurance.

### 2.  COUNT VI: BREACH OF LEASE

The City argues that a cause of action for breach of lease does not exist against the City because it was not a party to the lease.  (Doc. #45 at 4).  In response, the Floyds argue that the City is liable under the lease agreement as an undisclosed principal.  (Doc. #46 at 6).

In Florida, "an agent who makes a contract on behalf of an undisclosed principal is a party to the contract."  *Kinnon v. Arcoub, Gopman & Associates, Inc.*, 490 F.3d 886, 890 (11th Cir. 2007) (citation omitted)).  To hold an undisclosed principal liable, one must establish the existence of a principal-agent relationship and the essential elements of a contract.  *See Pittman v. Roberts*, 122 So. 2d 333, 334 (Fla. 2d DCA 1960); *Johnson v. Maddock*, 161 So. 842, 843 (Fla. 1935).  One can prove an agency relationship through circumstantial or direct evidence.  *See Pittman*, 122 So. 2d at 334.  Additionally, liability of an undisclosed principal applies only "to a simply executory contract or one not fully performed."  *Id.* (citations omitted).  An executory contract is generally defined as a contract in "which performance remains due to some extent on both sides."  *In re Learning Publications, Inc.*, 94 B.R. 763, 764 (Bankr. M.D. Fla. 1988) (quoting S. Rep. No. 95-989, at 5787, 5844, 6303 (1978)).  Here, under the lease agreement, performance remained due on each side.  (Doc. #37-1 at ¶¶ 3, 13).  The Floyds, as tenants, agreed to pay rent

each month, and CHR, as the Floyds' landlord, agreed to maintain the premises in a safe condition.  (*Id.*).

Under common law, "an agent is one who agrees to act on behalf of another, subject to the other's control."  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162 (11th Cir. 1993) (citation omitted)).  A municipality can be a party to an agency relationship.  *See generally id.*  There are three elements to establish the existence of an agency relationship under Florida law: "(1) acknowledgement [sic] by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent."  *Turi v. Stacey*, No. 5:13-cv-248-Oc-22PRL, 2015 WL 403228, at *9 (M.D. Fla. Jan. 28, 2015) (citations omitted)).  When establishing control, "[e]vidence of operation control includes, for instance, evidence that the principal controlled the internal affairs of an agent or determined how the agent operated on a daily basis."  *Id.* (citations omitted).

Turning to this action, the City, as principal, acknowledged CHR, as the City's agent, when the City delegated its responsibility to carry out obligations under the BMHR program to CHR.  (Doc. #37 at ¶ 20).  Secondly, CHR accepted such an undertaking by operating the BMHR program, which involved decision-making, determining eligibility, and other everyday operations.  (*Id.* at ¶ 21-22).  Finally, the City exhibited control over CHR through its extensive involvement in CHR decision-making and having a City staff member sit on CHR's board of directors as a liaison.  (*Id.* at ¶ 22).  Therefore, the Floyds, having alleged that an agency-relationship existed between the City, as principal, and CHR, as the City's agent, the Court finds that Count VI survives the motion to dismiss.

### 3. COUNTS VII and VIII: THE CITY'S DUTY AS THE UNIT OWNER

In response to the City's sovereign immunity argument, the Floyds submit that the City owed a duty as a property owner. (Doc. #46 at 7). Under Florida law, when determining tort liability, there are four categories of "governmental functions and activities:" (1) "legislative, permitting, licensing, and executive officer functions;" (2) "enforcement of laws and the protection of the public safety;" (3) "capital improvements and property control operations;" and (4) "providing professional, educational, and general services for the health and welfare of the citizens." *Trianon Park Condominium Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 919 (Fla. 1985).

Turning to this action, the role at issue is based on the City's status as the owner of the Unit and a "property control operation[]." *Id.* (Doc. #46 at 7). "First, for there to be governmental tort liability, there must be either an underlying common law or statutory duty of care with respect to the alleged negligent conduct." *Id.* at 917. When "a government entity builds or takes control of property or an improvement, it has the same common law duty as a private person to properly maintain and operate the property." *Id.* at 921 (citations omitted). In Florida, "a common law duty of care with respect to the maintenance of a building," has always existed. *City of Jacksonville v. Mills*, 544 So. 2d 190, 192 (Fla. 1989); *see also Green v. Sch. Board of Pasco County*, 752 So. 2d 700, 701 (Fla. 2d DCA 2000). Therefore, the Court finds that Plaintiffs stated a viable claim for retaliatory conduct and negligence.

### *COUNT VII: RETALIATORY CONDUCT*

Pursuant to Fla. Stat. § 83.64(1):

> It is unlawful for a landlord to discriminatorily increase a tenant's rent or decrease services to a tenant, or to bring or threaten to bring an action for possession or other civil action, primarily because the landlord is retaliating against the tenant. In order for the tenant to raise the defense of retaliatory conduct, the tenant must have acted in good faith.

Section 83.64(1).  Plaintiffs aver that CHR, as the City's agent, threatened to evict the Floyds in retaliation for the Floyds' complaints.  (Doc. #37 at 11).  The City does not assert that the Floyds acted in bad faith.  Therefore, the Court finds that the Plaintiffs stated a viable claim for retaliation pursuant to § 83.64(1).

### *COUNT VIII: NEGLIGENCE*

A cause of action for negligence has four elements: "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citations omitted)).  In this action, the City acted in a private capacity as the Unit owner, and as such, owed a duty to "properly maintain and operate the property." *Green*, 752 So. 2d at 701; *see also City of Jacksonville*, 544 So. 2d at 192. (Doc. #37 at ¶19).  Trisha claims the City breached its duty by failing to remedy the toxic mold in the Unit.  (*Id.* at ¶ 39).  Trisha submits that because of the City's failure to remedy the toxic mold, she could not maintain employment, resulting in a decrease of family income, and S.F. could not attend preschool.  Therefore, the Court finds that Plaintiffs filed a proper claim for negligence.

#### 4.   COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The City argues that the Floyds' intentional infliction of emotional distress claim is barred by sovereign immunity pursuant to Fla. Stat. § 768.28(9)(a).   The Court agrees.

"Florida courts have long recognized that Fla. Stat. § 768.28(9)(a) . . . bars claims for both intentional infliction of emotional distress" against "the State and its subdivisions." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1330 (11th Cir. 2015) (citation omitted)); *see also Thomas v. City of Palm Coast*, 3:14-cv-172-J-32PDB, 2015 WL 7429051, at *4 (M.D. Fla. Nov. 23, 2015).   The "reckless conduct" essential to such a claim mirrors "willful and wanton conduct under section 768.28(9)." *Williams v. City of Minneola*, 619 So. 2d 983, 986 (Fla. 5th DCA 1993).   (Doc. #45 at 8-9).   Accordingly, the Court dismisses Count IX with prejudice.

### E.   PRE-SUIT NOTICE

The City argues that the Floyds have not satisfied Fla. Stat. § 768.28(6)(a), which requires pre-suit notice for tort claims against "the state or one of its agencies or subdivisions." (Doc. #45 at 6-7).   It is necessary for an Amended Complaint to plead compliance with § 768.28(6)(a), although no express statute citation is required.   *Smith v. Rainey*, 747 F. Supp. 2d 1327, 1337 (M.D. Fla. 2010) (citation omitted).   Here, the Amended Complaint states that the Floyds provided pre-suit notice to the City.   (Doc. #37 at ¶ 93; Doc. #46 at 8).   Therefore, the Court finds that the Floyds sufficiently pleaded compliance with § 768.28(6)(a) in the Amended Complaint.

### F.   PUNITIVE DAMAGES

The City asserts one cannot recover punitive damages from municipalities.   *See* Fla. Stat. § 768.28(5).   (Doc. #45 at 9).   The Floyds concede the City's argument.   (Doc.

#46 at 8).   The Floyds argue, without legal authority, that punitive damages are recoverable under the FHA, ADA, and Rehabilitation Act.  (*Id.* at 8-9).  However, punitive damages "may not be awarded in suits under § 202 of the ADA and § 504 of the Rehabilitation Act." *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).  The Floyds' demand for punitive damages under the ADA and Rehabilitation Act must fail.  Nevertheless, punitive damages are recoverable in a private civil action under the FHA.  *See* 42 U.S.C. § 3613(c)(1).  Therefore, the Floyds' demand for punitive damages is applicable only to Count I of the First Amended Complaint and is dismissed with prejudice as to all other counts.

Accordingly, it is now

**ORDERED:**

Defendant City of Sanibel's Motion to Dismiss Counts I through IX of Plaintiffs' First Amended Complaint (Doc. #45) is **GRANTED** in part and **DENIED** in part.

1. Defendant, City of Sanibel's, Motion to Dismiss is **GRANTED** as to Count IX—Intentional Infliction of Emotional Distress.   Count IX is hereby **DISMISSED**. All other Counts survive at this Motion to Dismiss stage.

2. Punitive damages are applicable only to Count I under the Federal Fair Housing Act.  Punitive damages are **DENIED** as to Counts II and III.

3. Defendant's Motion to Dismiss is **DENIED** as to Counts I through VIII.

**DONE** and **ORDERED** in Fort Myers, Florida this 9th day of January, 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record