UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TRISHA FLOYD and CHRISTOPHER
FLOYD, on their own behalf and on
behalf of their minor child S.F.,

     Plaintiffs,

v.                                                           Case No: 2:15-cv-795-FtM-38CM

THE CITY OF SANIBEL,
COMMUNITY HOUSING AND
RESOURCES, INC. and KELLY
COLLINI,

     Defendants.
_____/

## OPINION AND ORDER[1]

Before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. 68), Defendant City of Sanibel's Amended Motion for Final Summary Judgment (Doc. 86), and each party's respective responses thereto (Docs. 92; 93). For the following reasons, the Court denies both motions for summary judgment.

## BACKGROUND

This action stems from mold found in Plaintiffs Trisha Floyd, Christopher Floyd, and their minor child's apartment. (Doc. 37). The Floyds are suing the City of Sanibel, Community Housing and Resources, Inc. ("CHR"), and Kelly Collini for, among other

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

things, not providing them a reasonable accommodation after discovering the mold in their apartment.² (Doc. 37).

The Floyds lived in an apartment in the Woodhaven, a twelve-unit apartment building. The Woodhaven is part of the City's Below Market Rate Housing program ("BMRH"). The City created the BMRH to provide housing to low and moderate-income persons. (Doc. 86 at 3). The City outlined its vision for the BMRH in the Sanibel Plan (Doc. 80-1) and codified the program in its Ordinances, which secures the housing element of the Sanibel Plan. (Docs. 86 at 3; 80-2). Pertinent here, the Ordinances allowed the City to hire a non-profit housing foundation to enact the BMRH. (Doc. 80-2).³ The City did just that with CHR in 1983. (Doc. 87-1 at 11).

As the operator of the BMRH program, CHR agreed to perform all reporting, administrative, and like obligations outlined in the Ordinances and Sanibel Plan. (Docs.

---

² The Floyds and Defendants CHR and Kelly Collini have settled this case as between them. (Doc. 32). Thus, only the City remains as a defendant.

³ Section 102-32 provides, in its entirety,

> [t]he city, after issuing public notice inviting proposals, may enter into an agreement, by ordinance, with one or more nonprofit private foundations and/or community land trusts created to acquire and hold land for the benefit of the community and provide secure affordable access to land and housing for City of Sanibel residents (a "housing foundation"), duly incorporated under the applicable state laws and approved by the Internal Revenue Service for tax deductibility status for contributions and donations received by it. The housing foundation may cause to be formed a nonprofit, private community land trust, that is an affiliate and/or subsidiary of the housing foundation and is comprised of a board of directors that is appointed by the housing foundation, for the purposes of assuming ownership or rights to land and structures in order to further the purposes of the housing foundation as the operator of the City of Sanibel's Below Market Rate Housing Program ("CLT"), and the housing foundation shall have the right to delegate any of its rights and responsibilities as provided for in this article to the CLT as deemed necessary by the board of directors of the housing foundation. Notwithstanding anything to the contrary as may be contained herein, the city council shall retain full rights, powers and privileges with respect to the implementation of the below market rate housing program provided for in this article.

(Doc. 80-2).

2

87-1 at 2; 68 at 24; 93; 80-3 at 1; Doc. 80-2). The City and CHR also executed a separate contract for CHR to build the Woodhaven with the City giving money for the building's construction costs. (Docs. 81-1 at 2; 81-4; 81-8).

After the Woodhaven was built, CHR transferred to the City the property on which the building sat. (Doc 87-1 at 60). The City, in turn, leased the property back to CHR for fifty years for the limited purpose of enacting the BMRH. (Doc. 87-1 at 62).

Enter the Floyds now. They applied to the BMRH housing program. (Doc. 86 at 6). Kelly Collini, CHR's executive director, testified that CHR reviewed the Floyds' application and sent a redacted copy to Judie Zimomra, the City's manager, for approval. (Doc. 81-3 at 26-27). Around this time, T. Floyd told CHR representatives that she and her child were sensitive to mold. (Doc. 69-1 at ¶ 8).

After the Floyds were accepted into the program, they signed a lease agreement with CHR and moved into the Woodhaven in early 2015. (Doc. 69-1 at 7). Within months, however, T. Floyd and her child began to experience signs of toxic mold exposure. (Doc. 69-1 at 3). On June 18, 2015, C. Floyd took samples from the apartment to be tested for mold – the samples were positive. (Doc. 68 at 26). T. Floyd then informed Patti Bohm, CHR's former housing administrator, of the results. (Docs. 69-1 at ¶ 13; 81-1 at ¶ 16). T. Floyd and her child were later diagnosed with biotoxin exposure and toxic mold exposure, respectively. (Doc. 68 at 27).

On July 7, 2015, Bohm told Collini about the mold-positive tests in T. Floyd's apartment. (Doc. 81-1 at ¶ 17). According to the Floyds, no action was taken to remediate the mold for several months – a point that Collini disputed. (Docs. 81-1 at 18; Doc. 94-1

3

at 6). On November 7, 2015, T. Floyd told CHR that her family would withhold rent if the conditions were not fixed. (Docs. 68 at 27; 93 at 7).

Two days later, T. Floyd met with Zimomra at Sanibel City Hall to discuss her issues as a CHR tenant and her and her child's mold-related illnesses. (Doc. 81 at 95). Zimomra thereafter emailed a summary of her meeting with T. Floyd to CHR members and Jim Jennings, a City council member. (Docs. 82-1; 81 at 100-103). Several days later, Bonnie McCurry, a CHR employee, emailed a proposed plan to remediate the mold to the Floyds. (Doc. 82-2). This plan included installing a new air conditioning system and running oxidizers for a minimum of eight hours to kill the mold. T. Floyd, through her attorney, said the proposed plan was incomplete and proposed an alternative one. (Doc. 83 at 1-5). Ultimately, neither plan was agreed upon. The Floyds then moved out of the Woodhaven apartment and brought this action.

The Amended Complaint alleges violations of the federal Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and the Florida Fair Housing Act ("FFHA"). (Doc. 37). It also alleges state law claims for breach of the Florida Landlord-Tenant Act, breach of lease, unlawful retaliation under Florida Statute § 83.64, and negligence.[4] (Doc. 37). Both parties now move for summary judgment. The Floyds move for partial summary judgment on liability, whereas the City seeks summary judgment on all claims. (Docs. 68; 86; 92; 93).

## LEGAL STANDARD

A moving party is entitled to summary judgment if the party shows there is no genuine dispute as to any material fact and is entitled to judgment as a matter of law.

---

[4] The Court previously dismissed the Floyd's intentional infliction of emotional distress claim. (Doc. 56).

4

*See* Fed R. Civ. P. 56. When evaluating a motion for summary judgment, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ([*citing* Fed. R. Civ. P. 56]). An issue of fact is material if it might affect the outcome of the case under the applicable law, and an issue of fact is genuine if a rational trier of fact, taking the record as a whole, could find for the nonmoving party. *See Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).

If the moving party meets the initial responsibility, the opposing party must set forth specific facts showing there is a genuine issue for trial and cannot rely on mere allegations or denials. *See Anderson*, 477 U.S. at 256-57. A mere scintilla of evidence supporting the opposing party's position is not enough. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations and citations omitted). The nonmoving party's evidence is to be believed and all reasonable inferences drawn in his favor. *See Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (citations omitted). Therefore, if a rational trier of fact could find for the nonmoving party, a summary judgment motion is defeated. *See id.*

5

Cross motions for summary judgment may be indicative of the nonexistence of a factual dispute. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citations omitted). "Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment." *Id.* But where parties take inconsistent legal theories and disagree as to the facts, the mere filing of cross motions for summary judgment does not warrant entry of summary judgment. *See id.* Courts are not bound by the parties' assertion that no material facts exist and may discover questions of fact on its own. *See Griffis v. Delta Fam.-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984).

## DISCUSSION

The parties' motions for summary judgment hinge on two major liability issues. First, whether the City and CHR had an agency relationship when it came to BMRH. Without an agency relationship, the Floyds cannot catch the City on the hook for its claims through vicarious liability. Second, whether the City directly controlled the Woodhaven. Naturally, the parties take conflicting positions on the level of control, if any, the City exerted over CHR and the Woodhaven. And the record before the Court conflicts as well.

In addition, the parties advance alternative arguments. The City argues it cannot be liable because of the common law theory of *caveat lessee* as it leased the Woodhaven property to CHR. The City also contends that it offered the Floyds a reasonable accommodation and therefore satisfied its obligations under the FHA, ADA, Rehabilitation Act, and FFHA. Lastly, the City maintains sovereign immunity bars the Floyds' claims for breach of landlord duties, breach of lease, and retaliatory conduct. The Court will address each argument in turn, starting with agency.

### A. Agency Relationship

A principal is liable for the tortious conduct of its agent, if the agent acted in the scope of its apparent authority. See *Life Ins. Co. of N.A. v. Del Aguila*, 417 So. 2d 651, 652 (Fla. 1982). Control by a principal is required for an agency relationship to exist. See *Goldschmidt v. Holman*, 571 So.2d 422, 424 n.5 (Fla. 1990) (finding that under Florida law, an actual agency relationship requires "(1) acknowledgment by the principal that the agent will act for him; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent."); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1162 (11th Cir. 1993) (holding that under the common law "an agent is one who agrees to act on behalf of another, subject to the other's control."). Notably, it is the right to control, rather than the actual control, that determines an agency action. *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 853 (Fla. 2003) (citation omitted);

Generally, the existence of an agency relationship is reserved for the trier of fact. *Villazon,* 843 So.2d at 853 (citation omitted); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 173 (5th Cir. 1975) (citation omitted). An agency relationship can be derived from a contract or inferred from past dealings between parties. See *Sapp v. City of Tallahassee*, 348 So. 2d 363, 367 (Fla. 1st DCA 1997). A factfinder also may find an agency relationship based on circumstantial evidence, even if both the principal and agent deny the relationship. See *Cleveland Compania Maritima, S.A. Panama v. Logothetis*, 378 So.2d 1336, 1338 (Fla. 2nd DCA 1980) (citation omitted).

As stated, the Floyds seek to establish CHR as the City's agent. (Doc. 68 at 10-12). They argue the City exerted significant control over CHR and its operations because (1) the City reserved full authority to implement the BMRH under its Ordinances; (2) it

7

reviewed and approved all rental applications for the BMRH; (3) it funded all administrative overhead for CHR and imposed restrictions on CHR's use of the funding; and (4) the City Manager was involved in and had final authority over CHR operations, including accommodations for disabled tenants. (Doc. 68 at 11). The City disagrees, arguing it had no control over CHR's actions and that CHR was solely responsible for accommodations and housing changes. (Doc. 93 at 8).

The record is rife with conflicting evidence about the City's control of CHR's operations. First, the Ordinances and the Sanibel Plan do not conclusively establish an agency relationship; however, they establish a framework for the CHR and City's relationship, including the use of liaisons, annual reports, and administration duties. (Docs. 68 at 11; 80-2).

Second, the City's and CHR's employees provided conflicting evidence about their employer's relationship between the entities. Bohm, CHR's former housing administrator, stated that the City, through Zimomra, "involved itself heavily in CHR operations," including management of Woodhaven, and that Zimomra would demand the settlement of issues with CHR tenants or BMRH properties. (Doc. 81-1). For example, Bohm stated that CHR personnel previously consulted with Zimomra about a modification request from a Woodhaven resident. (Doc. 81-1 at ¶ 10; Doc. 94-3). In contrast, Zimomra testified at her deposition that she never met or spoke with Bohm about CHR issues. (Doc. 94-3 at 1). Collini testified that the City had no role in whether CHR modified a CHR-owned structure. (Doc. 87-2 at 16-17). Further, Richard Johnson, CHR's president, testified that CHR's decisions are its own. (Doc. 87-3 at 4).

In short, Bohm maintains that City, through Zimomra, maintained significant control over both Woodhaven and CHR. (Doc. 81-1). But Collini, Zimomra, and Johnson remain steadfast that CHR operated independently of the City. (Docs. 94-1 at 3; 94-3 at 3; 87-3 at 4). To resolve such conflicting evidence will require this Court to judge credibility and weigh the evidence. But it is not the Court's function to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. What is more, neither party presents the Court with undisputed evidence to conclusively establish the existence or nonexistence of an agency relationship. Accordingly, based on the record before the Court, there are genuine issues of material fact about the extent of the City's control over CHR, *i.e.*, whether an agency relationship existed. Summary judgment is precluded on this issue.

## B. The City's Control Over the Woodhaven

Next, the City argues that even if CHR was its agent, it cannot be liable because it did not "own, maintain, or control the Floyds' unit." (Doc. 86 at 11). It also asserts that it cannot be liable under *caveat lessee* because it leased the property on which Woodhaven sits to CHR. (Doc. 86 at 11). Neither argument is persuasive.

A party's control of a premises triggers the duty to provide a reasonably safe premises.[5] See *Lee Cnty. Dep't. of Transp. v. Island Water Ass'n., Inc.*, 218 So. 3d 974, 977 (Fla. 2d DCA 2017). In addition, two or more entities may share control over a premises. *Metsker v. Carefree/Scott Fetzer Co.*, 90 So. 3d 973, 977 (Fla. 2d DCA 2012). Even if others have the same duty and fail to perform that duty, it does not act as a

---

[5] Previously, the Court stated that "[a] property owner is ultimately responsible for his 'non-delegable duty to provide reasonably safe premises for its invitees.'" (Doc. 56 at 6). However, at the heart of that duty analysis is whether a party controlled the property. Certainly, a property owner can have a non-delegable duty, but control is the ultimate question.

9

defense to an entity who assumes control over the premises. *Arias v. State Farm Fire & Cas. Co.*, 426 So. 2d 1136, 1138 (Fla. 1st DCA 1983). At bottom, the issue is whether the City controlled the Woodhaven.

Here, the Court encounters the same hurdle – genuine issues of material fact exist as to the City's control over the Woodhaven. As stated, Bohm testified that the City was involved heavily in managing the BMRH properties like the Woodhaven, and that Zimomra was involved in major issues relating to tenants, properties, and modifications requests. (Doc. 81-1). The Woodhaven ground lease provides that CHR is responsible for maintaining the buildings and making improvements. (Doc. 80-3). But other evidence supports the City's argument that it did not have control over the property, including Johnson's, Zimomra's and Collini's statements or testimony. (Docs. 81-3 at 102-103; 87-1 at 2; 87-3 at 4). In fact, Collini's deposition sheds some light on the disputed issue, in which she testified:

> Q. And the decision as to whether or not to accommodate a person with a disability in a CHR structure are made solely by CHR?
> Q. Correct?
> Do you understand what I'm asking you?
> A. Yes. Solely by CHR and our landlord tenant committee and our city manager.
> Q. Your "city manager," meaning whom?
> A. Judie Zimomra.
> Q. Okay. Let's talk about the Floyds specifically. Judie Zimomra didn't have any role in the manner in which you were going to accommodate the Floyds; isn't that correct?
> A. That's correct.
> Q. You didn't discuss with Judie Zimomra the Floyds' request and how to best accommodate that?
> A. No, I did not.
> Q. Because that was a CHR-owned structure, that was CHR's decision?
> Q. Correct?
> A. Yes.
> Q. The city doesn't have any role in whether or not you're going to make a modification to the CHR owned structure?

10

>    A. No. They would never have any say in that.
>    Q. Okay. Great. So when you mentioned Judie Zimomra, you didn't mean in something like that?
>    A. No.
>    Q. That's solely a CHR decision?
>    A. uh-huh.
>    Q. Yes?
>    A. Yes.

(Doc. 81-3 at 102-103) (objections omitted). This conflicting evidence is fatal to the summary judgment motions.

The City does not end there in seeking summary judgment. It also argues that the doctrine of *caveat lessee* applies. (Doc. 93 at 12). According to the City, because it leased the property on which the Woodhaven sits to CHR, it has no liability for the leased premises. (Doc. 93 at 12). Generally, *caveat lessee* provides that a landlord who delivers possession and control of a leased premises is not liable for injury. *See Veterans Gas Co. v. Gibbs*, 538 So. 2d 1325, 1327 (Fla. 1st DCA 1989) (noting that the rule was abrogated in Florida as to residential dwelling units). But control remains the issue, namely if City retained control over the Woodhaven, *caveat lessee* does not apply. For the reasons identified above, the issue is one for the jury and summary judgment is not appropriate.

**C. Reasonable Accommodation**

Even if CHR was the City's agent or it was liable because it controlled the unit, the City argues that it provided the Floyds with a reasonable accommodation and thus it did not violate the FHA, ADA, Rehabilitation Act, or FFHA.[6] (Doc. 86 at 14-15). It cites to the

---

[6] The City chiefly cites FHA authority for its argument that the proposed accommodation was reasonable under the FHA, ADA, Rehabilitation Act, and FFHA. In this context, that is proper because analysis of a reasonable accommodation claim is generally treated the same under the Acts. *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014); *Loren v. Sasser*, 309 F.3d 1296, 1300 n.9 (11th Cir. 2002).

following facts to show it gave the Floyds a reasonable accommodation: (1) the Floyds requested an accommodation about the mold in their unit; (2) CHR contacted Gary Ranard[7] of Air Technologies to address the mold complaint; (3) Ranard inspected the unit and made a recommendation; (4) CHR informed the Floyds of its plan and offered to house them at a motel; and (5) T. Floyd rejected the plan. (Doc. 86 at 15-16). But the Floyds respond that the City's proposed accommodation, remediation plan, and "six-month delay" in addressing the mold were unreasonable. (Doc. 92 at 6).

The FHA prohibits discrimination against a disabled person by refusing to make reasonable accommodations necessary to allow the person to use and enjoy the dwelling. *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). To prevail on a failure-to-accommodate claim, a party must prove "that (1) he is [disabled] within the meaning of the FHA; (2) he requested a reasonable accommodation; (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling; and (4) the defendants refused to make the accommodation." *Id.* (citations omitted). A person is not entitled to the accommodation of his choice, but is only entitled to a reasonable accommodation depending on specific circumstances. *Weiss v. 2100 Condo. Ass'n, Inc.*, 941 F. Supp. 2d 1337, 1343 (S.D. Fla. 2013) (citations omitted). "Whether a requested accommodation is required by law is highly fact-specific, requiring a case-by-case determination." *Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002) (quotation marks omitted).

Here, the Court must first determine when the Floyds requested an accommodation. The parties do not dispute that T. Floyd contacted Bohm on July 7, 2015

---

[7] The City and the Floyds disagree as to Gary Ranard's qualifications. But that disagreement is not pertinent at this time.

about mold in her apartment. (Doc. 81-1 at 4). Bohm promised to move the Floyds to a different unit. (Doc. 81-1 at 4). Bohm then told Collini about her conversation with T. Floyd. (Doc. 81-1 at 5). Based on these facts, CHR knew of the mold on July 7, 2015. But whether CHR's knowledge as of that date is imputed on the City depends on the disputed agency relationship between the City and CHR. See *LanChile Airlines v. Conn. Gen. Life Ins. Co. of N.A.*, 759 F. Supp. 811, 814 (S.D. Fla. 1991) (noting an agent's knowledge acquired within the scope of its authority is imputed to the principal). What is more, neither CHR nor the City took any action for five months. It was not until November 13, 2015, that a CHR employee emailed T. Floyd with the remediation plan. (Doc. 82-2). Consequently, the agency relationship is crucial to determine whether City was aware of T. Floyd's request. And the five-month delay may have constituted an effective denial. See *Bhogaita,* 765 F.3d at 1286 (stating a failure to make a determination on a request for accommodation may have the same effect as a denial). Because the disputed material evidence prevents the Court from deciding the agency matter, it need not consider whether the proposed remediation plan was a reasonable accommodation under the law.

**D. Sovereign Immunity**

Finally, contrary to the Floyds' argument, the City maintains that sovereign immunity bars the Floyds' claims for breach of landlord duties, breach of lease, and retaliatory conduct because the claims are not based on an express, written contract. (Doc. 86 at 17). The Floyds argue that the City is liable for those claims because it is an undisclosed principal to the lease agreement between CHR and the Floyds. Florida courts have routinely dismissed "contract claims" that are not based on an express, written contract based on sovereign immunity. See, e.g., *Champagne-Webber, Inc. v.*

*City of Ft. Lauderdale*, 519 So. 2d 696, 696 (Fla. 4th Dist. App. 1988). But courts have found an implied waiver of sovereign immunity for express, written contracts in which a state agency has statutory authority to enter. See *Pan-Am Tobacco Corp. v. Dept. of Corrections*, 471 So. 2d 4, 5–6 (Fla. 1984).

Here, the Floyds argue that CHR is the City's agent and that the "well-settled rule that an undisclosed principal is bound by simple executory contracts made by its agent" applies. See *Collins v. Aetna Ins. Co.*, 138 So. 369, 370 (Fla. 1931) (finding that "where an agent contracts or deals with a second party for a principal who is not disclosed, the second party may, after the discovery of the principal, hold liable either the agent of the principal."). To the extent that an undisclosed principal can be liable for a contract entered into on behalf of its agent, the Court agrees. Although no Florida court has decided whether a government entity has waived sovereign immunity as an undisclosed principal, it would contravene logic to allow an implied waiver of sovereign immunity for an express, written contract, but then to allow a city to claim sovereign immunity for contracts into which its agent enters. Without any case law to the contrary, the Court finds that City has waived its sovereign immunity to the extent it is an undisclosed principal on the lease agreement.

Nonetheless, this determination is not dispositive of the claims, but it is enough to defeat the City's argument. To find the City to be an undisclosed principal calls up the agency issue. As the Court has already indicated, such a determination is improper here. Therefore, the City's sovereign immunity argument fails, and the Floyds may pursue their state law claims.

## CONCLUSION

After a thorough review of the record, the Court finds that genuine issues of material fact remain and that neither party is entitled to judgment as a matter of law. The Court thus denies the Floyds' and the City's motions for summary judgment.

Accordingly, it is now

**ORDERED:**

1. Defendant City of Sanibel's Motion for Summary Judgment (Doc. 86) is **DENIED.**

2. Plaintiffs Trisha Floyd, Christopher Floyd, and their minor child S.F.'s Motion for Partial Summary Judgment (Doc. 68) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 26th day of September 2017.

*[signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record